The next case is 07-2542 Novartis Pharma v. Teva Pharma Good morning, Your Honor. May it please the Court. If it's acceptable to the Court, I would like to direct my remarks to the obviousness issue in the case and the inequitable conduct issue. And I fully appreciate there are other issues that are raised on which I'm content to rely on a brief subject, of course, to any questions the Court may have. And if I can start with the obvious, more than 20 years ago, this Court cautioned that patent validity was not a game to be played with pieces of paper, but was to be rooted in the facts of the real world. So the real world here was that in the early 1980s, Burroughs Welcome came out with a compound called acyclovir, which was a class of compounds called acyclic nucleosides. And it turned out to be very effective against genital herpes and shingles. And those were very large in lucrative markets. And so, as quoted by one of Teva's experts, everybody went into the field. Well, 20 years later, there are only three acyclic nucleosides that are approved for genital herpes and shingles. One is acyclovir, which was the pioneer compound. The second one is valcyclovir, which is a derivative of acyclovir. And the third is famvir, famcyclovir, the drug that's in question here. The trial court found that Teva had made a likelihood of success on defense of obviousness based on something called GB204. GB204 was a reference that was considered by the patent examiner during the prosecution of the patent. And under the precedent of this court, it should therefore be a more difficult burden for Teva to overcome that. But more than that, Teva argued and the judge found that the technology that was in GB204, which was designed to be used with acyclovir and turned out to be a failure with acyclovir, nevertheless made the success of famvir obvious. The technology of GB204 says that acyclovir has an oxygen atom on it, and it was known that it was poorly absorbed by the body. The GB204 reference says that if you take the oxygen off, it's better absorbed, but then the body's enzymes put the oxygen back in. There's a reference that was published about the time by Burroughs Welcome called the Krenitsky paper. It was a scientific paper. It's never mentioned in the court's opinion, but it is one of the most important things in the prior law. The Krenitsky paper says that there are two enzymes in the body that can act on deoxyacyclovir. One is called aldehyde oxidase, and that produces a bad result because it turns it into an inactive compound, something that's worthless. The other enzyme is called xanthine oxidase, and it turns out that does convert deoxyacyclovir into the active form acyclovir. The case is proceeding down there now. It is not scheduled for trial currently, and it's not expected. It would be tried before the beginning of 2009. Partly because of the court schedule. It's partly because at the time the PI was denied, the expert depositions had not been taken, and they're, of course, being taken now. So it's a matter of accommodating the expert depositions with the court schedule. Well, at this point, Your Honor, the market is pretty much devastated by the entry of Tevye's generic product. So there still is a degree of urgency, but we have to accommodate the court schedule and the schedule for completing the discovery. One of the things that the district court did was to conclude that acyclovir was an obvious lead component, or at least that was an issue, that acyclovir was an obvious lead component. Why is it or is it not? Well, I think the record as a whole, Your Honor, shows that there were many compounds that were possible leads. Not only acyclic nucleosides, but compounds that were not acyclic nucleosides. The statement, everybody went into the field, but we know that everybody didn't go to pencyclovir. Four companies did go to pencyclovir and looked at it. Three of them dropped it. But was there not a suggestion in the art that at least the acyclic compounds were appropriate and of interest? There were, Your Honor, but there were many. Relatively few? I guess it's all a question of probability. We're not talking about thousands. Well, if one looks at the various patents and publications that came out, there really were thousands. There were a smaller number that people focused on. The court certainly focused on a smaller number and looked at essentially four or five. The court did. Was that wrong? I think that was wrong, and we point out why it was wrong. But even more than that, the court then used this GD204 patent as the, quote, road map to pencyclovir. And even if pencyclovir had been one of only five choices, that road map simply was not an obvious choice. There were many things one could do. And as I said before, the 204 road map turned out to be a dead end for the very compound for which it was designed, acyclovir. Because with acyclovir, the conversion in the body was not efficient, and the result was chronic toxicity, and it was dropped. Was the failure due to something inappropriate in the techniques for creating a pro-drug, or was the failure due to the fact that the technique was applied to a different drug and not the pencyclovir? Well, the failure, Your Honor, was in not realizing that the route that was supposed to be the road map to the success or failure was in fact not a success for anything else. So, in the case of, the goal here is to develop a drug that is safe and effective, obviously. Well, with 6-deoxyacyclovir, the GD204 technology did not produce a drug that was safe. It had chronic toxicity problems. It was dropped. But the enzyme that converts pencyclovir in the body to the active form is the aldehyde oxidase, which is the one that converts acyclovir into an inactive form. The court says in its opinion that doesn't matter, but of course it matters, it matters a great deal. The second thing is that with 6-deoxyacyclovir, according to the Krenitsky article, again, it's one that the judge did not mention, and the judge never mentions either the toxicity that resulted from 6-deoxyacyclovir. He does note at one point in his opinion that it was not a success for Horace Wellcome, doesn't note why, but then says that that doesn't matter because it's countered by the success of gancyclovir. Well, that's inexplicable because gancyclovir was never approved for general herpes or for shingles. It was never used in the 6-deoxy form, which is what the 204 patent is all about. So how did that convert the success of gancyclovir, or even found success for gancyclovir? It has no support anywhere in the record. But going beyond that, for acyclovir, when you use the 6-deoxy variant, you can get up to 65 to 70% of the drug absorbed in the body. But for pencyclovir, the result was 9%. It was a failure. It didn't work. So the only thing, the beach of scientists went back and did more work and came up with the fact that one ester, the ester that's in pencyclovir, gave 45% absorption in the body and solved the problem. The judge says in his opinion that the GB204 patent teaches you that esters enhance bioavailability. There is not a word in that patent to that effect. There are examples of esters, but there is no statement anywhere that they improve and enhance bioavailability. And in the Kreditsky article, the scientific article, that was all about the 6-deoxy, what it says is esters have been tried with acyclovir and they offer no significant improvement. So the road map from GB204 to pencyclovir is a road map you can only draw when you know what the destination is. You can't get there from the origin. And I'd like to just briefly talk about the inequitable conduct case. The judge said that certain references, his words, were intentionally withheld and the applicant elected to withhold them. There's no evidence in the record to support that. The depositions that were taken, they were taken 20 years after the fact, the witnesses simply said when they were asked why you didn't cite something, they said, I don't remember whether we cited it or didn't cite it or why we cited it or why we didn't cite it. There was no recollection. There is nothing to support that anybody made a conscious decision, looked at those references and said let's withhold them, which is what the judge's intent is based on. There in fact is a lot of evidence that shows that there is no intent. The so-called Greek 121 patent, if I may very briefly. The Greek 121 patent, the EP counterpart was disclosed in the specification. The 833 patent, it shows, the record shows that weeks before the Boyd Declaration was filed, the patent applicant had a discussion with the examiner in a related case and discussed that. The 190 patent, the judge says in his opinion, was discussed at a conference with both applications. So there is nothing here and certainly nothing in those references that showed that they were so highly material that they should have been disclosed. Your argument is a good argument with respect to the withholding of references. I think there's a lot of persuasion in the argument there. What about the so-called misrepresentation? There was no misrepresentation. It was about the toxicity. The argument, as I read it in the prosecution history, is a comparison of encyclopedia and… Gensokyo. And that you were not arguing that encyclopedia has no real toxicity. But nonetheless, the references did suggest that. Actually, they don't. And the Boyd Declaration says that everybody agrees that the data in that declaration are correct. Gensokyo is 16 times as toxic as encyclopedia. They said that was surprising. They gave the examiner the data. It was a direct head-to-head comparison. The examiner accepted it. The references, the judge says in his opinion, that the references show that encyclopedia was not toxic. Well, it is toxic at certain levels. The references don't say it's not toxic. The A33 patent, in fact, shows that at higher levels it does cause cytotoxicity. The Greek 121 patent, which is our own patent, says it was not toxic at 100 micrograms per millimeter. The Boyd Declaration shows that at higher concentrations, encyclopedia is toxic. But the main point is the so-called misrepelled references don't compare encyclopedia to encyclopedia. There is no basis. That's certainly clear. But the only thing I read in the district court's opinion was this conclusion that you had made an argument that it was unexpected that this was lesser toxicity when you had references that showed, in fact, it wasn't toxic. But the references don't show it was non-toxic. It shows they had low toxicity. But that tells you nothing about its relative toxicity compared against encyclopedia. That was the point of the declaration, and it was truthful. Thank you. Thank you. Good morning. Let me touch briefly on a procedural matter that is the subject of the question from the panel. Fact discovery is complete in this case. Expert discovery is going to be complete within the next few weeks. The case is going to be ready very, very soon for a final disposition. Even if you remanded, the judge would undoubtedly consolidate any further consideration of injunctive relief with the resolution on the merits. The point is that there is very little practical significance any longer in this case to the preliminary injunction. Since TEVA has been on the market for some time, if Novartis is successful in overcoming the offenses that the judge thought they would not succeed in overcoming, there's going to be a damages trial in any event. So what was significant a year ago is no longer significant as a practical matter. Let me speak first to the likelihood of success. A couple of things are important to keep in mind. First, the point is whether the district court clearly erred in accepting and crediting the testimony of TEVA's expert witnesses. I suggest if you examine the argument that Novartis made in his brief and the argument that Mr. Bechtol made this morning, they are stressing that we were right. The point is that they have to show that the district court, in relying on the testimony primarily of Dr. Broome, and if you read nothing else in the record, let me encourage you to read the declaration of Dr. Broome, which is very detailed and addresses all of the points that Mr. Bechtol raised in his argument. The issue for you is whether or not it was clear error for the district court to accept Dr. Broome's testimony on those things, and I suggest that you will not be able to conclude that it was. The context of this patent is important, and it bears on both the obviousness and an equitable conduct argument. This GB208 publication that Mr. Bechtol disparaged was invoked by the examiner eight times in rejecting these claims. These claims were rejected eight times as unpatentable over this GB204. But ultimately they were allowed. But only after the applicants made representations to the examiner that we contend were not true. It is not simply a matter of withholding particular references. It is making a statement, and while Mr. Bechtol to the court focused... Let's keep on the obviousness. All right. You were making the argument that the GB204 really was a road map, and the point that the examiner rejected it repeatedly, but the examiner allowed it. He allowed the claims over that reference. Well, I'm going to keep going on this topic. I would like to hear the answer that you are about to give, because that's a fact that was in the Constitution. Well, I'll try and answer both. First, let me quickly summarize the obviousness case. On the basis of the prior, fantacyclopine was not patentable because it was an obvious solution to a known problem with a known compound. It is, as I'm sure you understand, the prodrug of pancyclovir. Pancyclovir was a known compound, and it was in a class of compounds as to which persons of skill in the art knew had poor oral bioavailability. They were effective. If you injected this into laboratory animals, it was an effective antiviral agent, but it didn't pass in its native form, did not pass sufficiently rapidly through the cell membranes in the intestines to be useful, except at very large doses, before it was excreted. So there was a problem. It was a known problem, and there was a known solution. This is where GB204 comes in, and this is undoubtedly why the examiner rejected these claims eight times. GB204 discusses two very similar compounds to pancyclovir, and identifies two modifications. The so-called... And you're arguing that the only reason the examiner relented and ultimately allowed the claims is because of the representation with respect to toxicity. Not simply toxicity. In fact, the more important representation was that... Well, both representations were that pancyclovir had surprising and unexpected characteristics. That was the key to overcoming the obvious disrejection. There was something surprising about pancyclovir. Now, the first thing they said was surprising was that the prior art taught that compounds that had a methylene substituent at a particular place were not effective, and they said that repeatedly and categorically. These methylene compounds are not effective antiviral agents. They should not... The substitution of a methylene should not result in an effective antiviral compound. The prior art clearly teaches that such a moiety, i.e. a methylene moiety, should not work. These are categorical statements saying that the expectations of persons of skill in the art is that compounds like pancyclovir that have a methylene unit don't work, and because pancyclovir works, it's surprising. Now, that was critical. They had to. The examiner asked them, well, why is this... So why? Consistently. And they said, well, we have a methylene in persons of skill. I would say methylene doesn't work. The problem is the prior art that they concealed showed that methylene compounds did work. There were at least two, and one of them was the metabolite of pancyclovir. It could not possibly have been surprising and unexpected that the prodrug of pancyclovir would be effective, even though both the prodrug and the metabolite had a methylene, because the prior art disclosed that this particular drug, pancyclovir, was effective as an antiviral drug. So it's not simply that they concealed prior art, although that is part of it. They made a statement that was false, and the prior art that they concealed would have shown that contrary to their statements, the prior art as a whole would not have left a person of ordinary skill to be surprised that pancyclovir was an effective antiviral drug. Was the false statement you just alluded to a basis for the inequitable conduct rule? Oh, yes. The issue there was with respect to the comparison of toxicity between pancyclovir and ganciclovir, and the allegations of withholding references that showed no toxicity. I believe the district court addressed both of you, Your Honor. And let me turn then to the toxicity representation. I mean, we don't dispute the data that shows that, at least under some circumstances, pancyclovir may be less toxic than ganciclovir. Again, that wasn't what the applicants had to show. They had to show something that was surprising, and the misrepresentation was that it was surprising that pancyclovir would be less toxic than ganciclovir, because the prior art taught that pancyclovir had low toxicity. There was nothing in the prior art that would have taught a person of skill to expect pancyclovir to have a higher toxicity than ganciclovir. And again, remember the context. These applicants had to persuade the examiner that there was something unexpected, something surprising about pancyclovir. And both of the points that they stressed in order to show that were false and were inconsistent with the prior art that they didn't disclose to the examiner. That's the heart of the inequitable conduct issue. The issue for you is whether or not that is sufficient to create a substantial issue. The district judge is going to try this case or resolve this case in some fashion and make a final determination whether or not Teva has proven inequitable conduct. The question here is whether Teva has raised enough of an issue on both obviousness and inequitable conduct to refute, under the Amazon.com standard, the attempted demonstration of likelihood of success. Let me also turn to the lead compound issue that I know Judge Lin mentioned in his question to Mr. Bechtold. I suggest this is not a case where lead compound analysis should make a great deal of difference. The goal of the Beecham scientists who were developing pancyclovir was not to come up with a new drug. It was to solve a known problem with an old drug. Pancyclovir is an improved version of pancyclovir. Indeed, Beecham scientists themselves internally just referred to pancyclovir as oral pancyclovir. The Supreme Court in PSR made it clear that any problem known in the field supplies motivation for a solution which is obvious. That is exactly the situation we have here. You have a known drug, pancyclovir, with a known problem, poor oral bioavailability, and an obvious solution. These two substitutions that are both disclosed in this British patent application, which in fact work. And indeed, that's exactly what the Beecham scientists did. The work papers that are in the record make it clear that they relied on Beecham's work and used that as a basis to develop a pro-drug for pancyclovir. It's not a question of picking a single compound as a lead compound because you want to come up with a new compound. That's really not the situation. But even if you apply that principle, Dr. Broom explained, and the district court was entitled to credit his explanation, as to why you would include pancyclovir on a fairly short list of compounds that had the properties of low toxicity and focused antiviral effectiveness. In other words, if they would attack the virus without doing damage to healthy cells, then it was a relatively small number of compounds that had those characteristics, and pancyclovir was one of them. But I suggest you don't have to get to a lead compound analysis in this case, because this is really just an improvement on a prior compound. I have a few more minutes, but since Mr. Beck told us intentionally to rely on his papers for irreparable harm, I'll end this way. So if you have no questions, I'll sit down. Let me address first Mr. Degner's comments that Veacham hid that pancyclovir had activity. First, if you read the prosecution papers, you can see that when Veacham discussed the references, they specifically pointed to methylene compounds that did have activity. They simply said they had lower activity than the corresponding ethers. But most important, they gave the examiner the tippy paper. The tippy paper says pancyclovir has activity. They did not hide the fact that pancyclovir has activity. They put it right in front of the examiner. Mr. Degner said that what the judge did was to credit and accept the testimony of their experts, and that's one of our problems here, is that we were not given a live hearing. We were not given the opportunity to cross-examine them. I can't tell you what would have happened if we'd cross-examined them here, but if you look at the record in the Sanofi case, the Clavix case, you would see that the cross-examination of the defendant's experts was the basis on which the court discredited the obviousness argument and granted the preliminary injunction. We never got that opportunity here. On the procedural aspect, it's true. If you remand the case, it's very likely that Judge Kavanaugh will consolidate it with the trial on the merits, but he may not. And if you clearly tell him that he got obviousness and an inequitable conduct wrong and the presumption of irreparable harm applies, we may get this injunction before we have to go through a trial. Even if he consolidates it with trial, he can grant the injunction at any time that he feels it's appropriate. He doesn't have to wait to the conclusion. Finally, whether or not peniciclovir was a lead, GB204 wasn't the solution. GB204 was a dead end that resulted in a compound that was not safe and not effective. Peniciclovir is. Nobody else came up with it, in spite of the fact that everybody was working in the field. Thank you.